## MOSES v. ARCHIE McFARLAND & SON.

No. 7548.   Decided April 30, 1951.   (230 P. 2d 571.)

See 2 C. J. S. Agency, Sec. 57.   Contract by agent, ratification of.   2 Am. Jur., Agency, Sec. 208 et seq.; 44 A. L R. 925.

*Warwick C. Lamoreaux, David K. Watkiss,* Salt Lake City, for appellant.

*Dan B. Shields,* Salt Lake City, for respondent.

LATIMER, Justice.

Respondent commenced this action in the court below to recover damages incurred because of appellant's failure to deliver to respondent 30,000 pounds of boneless mutton in weekly shipments of not less than 3,000 pounds each, in accordance with the terms of a contract entered into between the parties.

Respondent doing business as Rancho Packing Company, is a manufacturer of luncheon meats, with his principal place of business located in Los Angeles, California.   Appellant is a wholesale meat packer, with its principal place of business located in Salt Lake City, Utah.   It sells its products in the intermountain and Pacific Coast areas, and at the time of the transaction involved herein maintained a sales office in San Francisco, where several salesmen were employed.

There is a dispute between the parties as to whether there was one or two separate transactions. It will make little difference which view we take, in view of the fact that we decide this case on appellant's ratification. Respondent's version is that some time prior to October 28, 1947, he ordered a carload, or 30,000 pounds, of boneless mutton from appellant, the sale being made and handled by one D. C. Basolo, admittedly a salesman in appellant's San Francisco office. A few days later, Basolo, still representing the appellant, obtained from respondent over the telephone another order for meat. Four house orders, all dated October 28, 1947, were prepared by the San Francisco office of the appellant corporation. One covered 30,000 pounds of mutton, which was filled by appellant's shipment of a carload of mutton to respondent on October 29, 1947; the second one was for 5,000 pounds of gullet meat and 2,000 pounds of lamb cheeks; the third involved 5,000 pounds of pigs' feet; and the last was an order for an additional 30,000 pounds of boneless mutton at 24½ cents per pound, to be shipped as available. The latter house order, which is involved in the present controversy, contained the following entries.:

"30,000 pounds boneless mutton @ 24½c. Ship each week in lots of no less than 3000 #. More if available."

After the telephone conversation or conversations with Basolo, respondent prepared purchase orders, the one of importance in this litigation being No. 7001, dated October 28, 1947. A copy of this purchase order was sent to appellant in the regular course of business. This purchase order shows the purchase of 30,000 pounds of boneless mutton at 24½ cents per pound, 5,000 pounds per week.

On October 29, 1947, Basolo wrote to respondent as follows:

"In confirmation of our phone conversation on the above order, we will ship on our reefer rig on its weekly trips to Los Angeles a minimum of

3000# each load until complete or more if you desire.

· "We have advised the plant that lots of less than 3000# are not desirable because of your production schedule. The delivered price on this order is 24½ cents per pound."

The above letter was written on appellant's letterhead, and made specific reference to respondent's purchase order No. 7001. It was signed Archie McFarland & Son, Inc., by D. C. Basolo, District Manager.

On November 8, 1947, appellant commenced filling the second order for 30,000 pounds of mutton. On that date, 2,851 pounds were shipped and the shipping order prepared in the Salt Lake office refers to respondent's purchase order No. 7001. Subsequent shipments in amounts varying from 400 pounds to 1084 pounds per shipment were made until December 6, 1947. During the same period appellant made partial shipments of the meats called for by the other purchases.

Early in January of 1948 respondent and Paul McFarland, general manager of appellant corporation, had a telephone conversation regarding appellant's delay in filling the order. In this conversation respondent was requested to notify appellant of the exact amount of mutton received. On January 9, 1948, respondent wrote appellant as follows:

"Pursuant to our telephone conversation I checked to see how much boneless mutton we have received and found of the total amount, we had only received 6,635 pounds, leaving a balance of 23,365 pounds.

"After speaking to you, I realized that you are tightly pressed and that the conditions in general are difficult; however, while our original agreement, as covered by our order No. 7001, was for 3,000 pounds minimum per week, the last shipment on November 29 amounted to only 400 pounds.

"Since calling this to your attention the other day, I know you are going to get busy to complete this transaction and since doing so, I would like you to stress a point toward the 3000 pounds if possible as our shortage of supplies is very acute."

Appellant replied by a letter dated January 15, 1948, which reads as follows:

"In reference to your letter of January 9, 1948, we will do our utmost to complete transaction of furnishing boneless mutton as referred to in your letter.

"At present, due to conditions beyond our control, it is almost impossible to obtain any mutton to bone or to sell carcass weight. In other words, there are no sheep coming to market, but within the next three or four weeks we expect some producers to start culling their herds and we will get back into production again."

Respondent received no further shipments of mutton and in April, 1948, his stock had become so low that it was necessary for him to purchase elsewhere at the prevailing price of 36 cents per pound.

On May 25, 1948, appellant was notified by counsel for respondent that he had been compelled to purchase 23,365 pounds of mutton on the open market and had paid 36 cents per pound; and that there was owing respondent from appellant the difference of $11\frac{1}{2}$ cents per pound on the 23,365 pounds which appellant had failed to deliver and for which it must pay. At that time and in a written reply to that letter, appellant requested a copy of "the certified and accepted purchase order covering the boneless mutton," and represented to respondent that upon presentation of an accepted order it would continue delivery of the meat. Respondent furnished appellant photostatic copies of his purchase order No. 7001, the letter of October 28, 1947, signed by Basolo, and appellant's letter of January 15, 1948.

On June 7, 1948, appellant acknowledged receipt of the photostatic copies previously requested, and informed respondent that this transaction was one of several in which Basolo had acted without authority and without knowledge on the part of appellant; that because of these several improper dealings Basolo had been dismissed; that in its letter of January 15th appellant had informed respondent that it was unable to furnish any boneless mutton and that at that time appellant was not aware that there was an agreement to furnish any specific amount; that appellant had no mutton on hand and did not expect to be able to buy any for some time to come; that in order to uphold its reputation appellant would do its best to offset any inconveninece

caused to respondent because of his dealings with Basolo.

Thereafter, further attempts on the part of respondent to obtain either money damages or the meat having failed, he commenced this action. The trial court found in favor of respondent and entered judgment against the appellant in the amount of $2,686.98, with interest from April 28, 1948.

On this appeal we need only deal with two of appellant's contentions: (1) That the evidence is insufficient to establish a ratification by the appellant; and (2) that the judgment is excessive because respondent did not reasonably mitigate his damages. Because of our holding on the first ground, we do not deem it necessary to consider Basolo's authority or apparent authority.

The general rule with respect to ratification can be found on page 805, *Williston on Contracts*, Rev.  Ed., Vol I. The rule is there stated as follows:

"Subsequent affirmance by a principal of a contract made on his behalf by one who had at the time neither actual nor apparent authority constitutes a ratification, which in general, is as effectual as original authorization, provided such affirmance and ratification are not against public policy. Not only is a contract formed between the principal and the third person, but the agent is absolved from liability for the loss which may happen because of his unauthorized action. *Ratification like original authority need not be express. Any conduct which indicates assent by the purported principal to become a party to the transaction or which is justifiable only if there is ratification is sufficient.* Even silence with full knowledge of the facts may manifest affirmance and thus operate as a ratification. The person with whom the agent dealt will so obviously be deceived by assuming the professed agent was authorized to act as such, that the principal is under a duty to undeceive him. * * * *So a purported principal may not be wilfully ignorant, nor may he purposely shut his eyes to means of information within his possession and control and thereby escape ratification 'if the circumstances are such that he could reasonably have been expected to dissent unless he were willing to be a party to the transaction.' * * *"* (Emphasis added.)

The evidence fairly shows that either in a previous transaction or as part of the same transaction respondent had

placed an order for boneless mutton with appellant company through Basolo; that the first order in point of time or shipment was promptly filled by appellant corporation; that all orders except the one in dispute were accepted by appellant strictly according to the terms agreed upon between Basolo and respondent and were filled by appellant; that respondent, in the regular course of business, mailed a copy of his purchase order No. 7001 to appellant; that appellant received the copy of respondent's purchase order, or received a copy of Basolo's house order, since the invoice for the first weekly shipment of mutton called for in the disputed order was dated November 8, 1947, and it refers to respondent's purchase order No. 7001; that this invoice was billed out within ten days from the date of the purported contract; that the first weekly shipment substantially complied with the provisions of appellant's house order; that though respondent communicated with appellant by letter and by telephone several times regarding appellant's delay in filling the order, appellant did not at any time deny the receipt of the house order, did not repudiate any of its terms, and did not deny Basolo's authority to bind appellant to the agreement until the letter of June 7, 1948, which was written long after legal proceedings were threatened and the time for complete performance had passed.

Furthermore, appellant's silence and failure to disaffirm are accompanied by other factors which would permit the trial judge to find there was a ratification. Without considering the fact that respondent had no knowledge of appellant's usual practice, it is certain in this case that its conduct established acceptance of the order. Appellant's general manager testified that the usual practice of appellant company was to allow its salesmen to offer the merchandise to prospective purchasers, and, if the buyer accepted the offer, the salesmen was required to submit the contract for confirmation; that the appellant processed the

order by one of two methods, either by filling it, or by notifying the agent of its rejection; that the buyer was informed of the rejection by the salesman, who, upon being informed that the order would not be accepted, was required to go to the buyer and apologize. In the instant case there was no apology and appellant undertook to fulfill the agreement by making partial shipments of the mutton. Appellant's invoices show that at least five regular weekly shipments were made commencing November 8, 1947, up to and including December 6, 1947. The first of these shipments was 2,851 pounds, which indicates some knowledge of the terms of the agreement and substantial compliance with its terms as to that first shipment. After the shipments ceased, respondent discussed the failure of appellant to complete its agreement with Paul McFarland, and on January 15, 1948, respondent was informed that appellant would do its utmost to complete the transaction of furnishing the mutton as ordered. During this period, there was no contention advanced by appellant to the effect that it need not ship any stated amount. Again, as late as May 27, 1948, appellant, in a letter to respondent, represented that upon presentation of a copy of the certified and accepted purchase order, it would continue delivery of the mutton.

It matters little whether we consider the dealings as one transaction, as contended for by appellant, or two transactions, as claimed by respondent. If we accept the first version, the appellant cannot confirm a part of the contract beneficial to it and reject the portion it claims to be to its detriment. On the other hand, if we adopt the second view that there were two separate transactions, then appellant accepted the first, leading respondent to believe Basolo had authority to bind appellant. Appellant, knowing this, had the duty, if it intended to disaffirm the second contract, to notify respondent at the first reasonable opportunity. It could have done this as early as

November 8, 1947, but it neglected to suggest a disaffirmance until some six months later. Immediately after receipt of the house order, it started complying with the agreement and its every act, until litigation was threatened, suggested to respondent that it had confirmed the order.

In support of its second contention, appellant argues that respondent did not properly mitigate his damages because he did not make his purchase of mutton elsewhere immediately after appellant's failure to complete delivery; and that by waiting until April, 1948, respondent had unnecessarily enhanced his damages.

The rule is that after a purchaser has reason to know that a breach has occurred, or that a breach is impending under circumstances such that it is not reasonable for him to expect the seller to prevent damage, he is expected to take such steps to avoid further loss as a prudent person would take. In general, however, it may be reasonable for the purchaser to expect the seller to prevent losses after a breach has occurred, particularly if the breach is followed by assurance from the seller that proper performance will soon be rendered and further damage prevented.

Allowing ten weeks for the shipments of 3,000 pounds each to be made, complete performance of the contract was due in mid-January, 1948. In a telephone conversation in early January, appellant led respondent to believe the agreement would be complied with. Again, in a letter of January 15th, appellant informed respondent that within the next three or four weeks it expected to get back into production and that the transaction would be completed. In view of these representations respondent was doing no more than offering appellant a fair opportunity to fulfill its contract and he was not required to purchase the mutton elsewhere until he was assured of a rejection. Appellant encouraged respondent to wait for

performance of the contract by it and now seeks to complain because he waited a reasonable time. There is no question of bad faith in waiting, as respondent as late as June, 1948, in an effort to settle the controversy, offered to permit appellant to furnish the mutton. Prior to this time, appellant had represented it had 20,000 pounds on hand.

Furthermore, there is no evidence that the price of mutton was less in January or February than it was when the purchase was made in April. Paul McFarland testified that on January 26, 1948, the price of boneless mutton was 33 to 34 cents per pound. The price which respondent eventually paid for the mutton he purchased in April was 34 cents a pound, f. o. b. Fort Worth, Texas, and the difference between that price and the 36 cents per pound allowed as damages by the trial court was for freight charges on the shipment.

The judgment of the trial court is affirmed. Costs to respondent.

WOLFE, C. J., and WADE, McDONOUGH and CROCKETT, J. J., concur.