**2018 UT App 114**

### THE UTAH COURT OF APPEALS

STEVEN R. SUMSION,
Appellant,
*v.*
BAY HARBOR FARM, LC,
Appellee.

Opinion
No. 20170066-CA
Filed June 14, 2018

Fourth District Court, Provo Department
The Honorable David N. Mortensen
The Honorable Christine S. Johnson
No. 140400991

Steven R. Sumsion, Attorney for Appellant

Stephen W. Geary, Attorney for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
GREGORY K. ORME and DIANA HAGEN concurred.

HARRIS, Judge:

¶1      For more than a decade, attorney Steven R. Sumsion has tried to collect attorney fees he believes he is owed for representing Bay Harbor Farm, LC (Bay Harbor) in a workers' compensation case. Bay Harbor refuses to pay Sumsion's bill, because Bay Harbor maintains that it never hired Sumsion, and that Sumsion only represented Donald Proctor, one of Bay Harbor's members, in that litigation. The dispute between these parties has reached us once before, when we determined that an attorney's lien that Sumsion filed against Bay Harbor's property was not a "wrongful lien" under Utah's Wrongful Lien Act. *See Bay Harbor Farm, LC v. Sumsion* (*Bay Harbor I*), 2014 UT App 133, 329 P.3d 46. In that case, we left open the question of "[w]hether . . . Bay Harbor was actually Sumsion's client." *Id.* ¶ 14.

¶2     That question is now squarely presented to us, and we answer it in the negative, because we conclude that Proctor did not have authority to retain Sumsion on behalf of Bay Harbor, and that Bay Harbor did not otherwise retain Sumsion. This conclusion compels the dismissal of several of Sumsion's claims, and we conclude that Sumsion's remaining claim (for unjust enrichment) is untimely filed. Accordingly, we affirm the district court's entry of summary judgment in favor of Bay Harbor.

BACKGROUND

¶3     In 1994, Proctor, Stan Weed, and two other individuals formed Bay Harbor, a Utah limited liability company (LLC). According to its Articles of Organization, the company was formed "to engage in the business of the production and sale of agricultural products." Weed and Proctor each held a 45% interest in Bay Harbor, and the other two members collectively held a 10% interest. Substantially all of Bay Harbor's assets consist of real property located in Utah County. Bay Harbor began as a member-managed company, but in 1997, the company was changed to a manager-managed company. Bay Harbor's Amended Articles of Organization, filed in 1997, list both Weed and Proctor as managers. Bay Harbor does not have—and has never had—a written operating agreement.

¶4     Bay Harbor's founding members intended "to operate the real property as a farm while awaiting an opportunity to sell the property for development, with the hope that operating income would cover the operating and mortgage costs." However, the company never turned a profit, and the only time it distributed money to its members was when it sold various portions of real property it owned.

¶5     In 2001, Weed and Proctor had a falling-out, and Weed, acting alone, "concluded that it was counterproductive to continue to try to operate Bay Harbor as a farm," and he

"informed [Proctor] that Bay Harbor would cease operation." Purporting to act on behalf of Bay Harbor, Weed filed Articles of Dissolution in an attempt to dissolve the company. That same year, Bay Harbor leased its property to Proctor "for the nominal cost of $1 per year, plus the obligation to pay for water shares, insurance, mortgage payments, and related expenses for operating the property as a farm." According to Weed, the company was dissolved "so that [Proctor] would be operating independently and not under the umbrella of the LLC." However, even assuming that the 2001 dissolution papers are valid, Bay Harbor has never completely wound up its operations; indeed, to this day it continues to own real property in Utah County.[1]

¶6    In 2002, a worker was injured while assisting with the farm operations on Bay Harbor's property. Eventually, that worker filed a workers' compensation claim against both Bay Harbor and Proctor (the Workers' Compensation Litigation). In 2005, the Utah Labor Commission notified Weed, as registered agent for Bay Harbor, about the Workers' Compensation Litigation. Weed responded by sending a letter to the Labor Commission asserting that Bay Harbor should not bear any liability because the company had been dissolved in 2001, prior

---

1. "Winding up" is the process that a company goes through prior to dissolution, in which it pays its final debts, settles its "activities and affairs," and "marshal[s] and distributes" its remaining assets. *See* Utah Code Ann. § 48-3a-703(2)(a) (LexisNexis 2015). During an LLC's winding-up period, the company continues to retain much of its previous authority, including the power to "settle disputes by mediation or arbitration" and to "transfer the [LLC's] property," but the company "continues after dissolution only for the purpose of winding up." *Id.* § 48-3a-703(1)–(2).

to the worker's injury. Weed took no other action to defend Bay Harbor in the Workers' Compensation Litigation.

¶7 Around that same time, Proctor retained Sumsion to defend him personally in the Workers' Compensation Litigation. Sumsion believed that Proctor had authority to hire him to also represent Bay Harbor, and therefore Sumsion entered an appearance in the Workers' Compensation Litigation on behalf of both Proctor and Bay Harbor. According to his billing records, Sumsion began performing work purportedly on Bay Harbor's behalf in February 2005. Sumsion's billing entries regularly include time he spent with Proctor and Proctor's wife Anna (Anna[2]); the entries do not reflect any meetings with Weed.

¶8 In December 2005, some ten months after his first billing entry, Sumsion sent an engagement letter to Proctor (the 2005 Engagement Letter). The letter was addressed to both Donald and Anna Proctor, and listed "Donald Proctor, Manager" of Bay Harbor, as an additional addressee. The letter referenced "Bay Harbor Farms, LLC related activities and other personal matters" as the subject of the retention. The letter also listed an outstanding balance of $73,119.36. The letter did not specifically mention the Workers' Compensation Litigation, nor did the letter contain any mention of Weed. Proctor counter-signed the letter twice, once on a line above his own name, and once on a line above the phrase "Bay Harbor Farms, LLC, Don Proctor, Manager." Anna also signed the letter on her own behalf.

¶9 The same day they signed the engagement letter, Proctor and Anna also signed a promissory note (the First Promissory Note) in favor of Sumsion. As with the 2005 Engagement Letter, Proctor signed the First Promissory Note twice, once on a line

---

2. Because Donald Proctor and Anna Proctor share the same last name, we sometimes refer to Anna Proctor by her first name, with no disrespect intended by the apparent informality.

above his own name, and once on a line above words proclaiming him to be the "manager" of Bay Harbor. The First Promissory Note contained an acknowledgement that "the balance owing" to Sumsion's law firm was $73,119.36, and provided that "this Note or any payment hereunder may be extended from time to time by the Holder hereof without in any way affecting the liability of such parties."

¶10    Sumsion entered his final billing entry related to the Workers' Compensation Litigation on July 13, 2006. On September 13, 2006, Sumsion filed an attorney's lien against Bay Harbor's property, claiming that Bay Harbor owed him $119,168.48 for work he performed on its behalf.[3]

¶11    In response, Bay Harbor filed a lawsuit seeking a judicial declaration that Sumsion's attorney's lien was wrongful, and eventually the case found its way to this court in *Bay Harbor I*. There, we determined that Sumsion's lien was not wrongful. *Bay Harbor I*, 2014 UT App 133, ¶ 11. We stated that Sumsion filed an attorney's lien, which is "expressly authorized by statute, and it is therefore not wrongful," and that "[t]his is true even if it ultimately proves unenforceable, whether because Bay Harbor was not Sumsion's client, because the Bay Harbor property was unconnected to the workers' compensation claim, or on some other basis." *Id.* We specifically declined to address the question of whether Bay Harbor was actually Sumsion's client, preferring not to address that question in the context of that case. *Id.* ¶ 14 (stating that "[w]hether or not Bay Harbor was actually Sumsion's client should be evaluated in a proceeding other than

---

3. Sumsion's lien, dated September 13, 2006, asserted that "the legal work performed with respect to Bay Harbor . . . remains unpaid more than thirty (30) days since delivery of the demand for payment." Thus, it appears that Sumsion demanded payment no later than approximately August 14, 2006.

an expedited wrongful lien hearing, upon consideration of any relevant evidence the parties may present").

¶12    In 2008, after Sumsion recorded his attorney's lien, Proctor passed away. Roughly a year later, in January 2009, Anna—purporting to act on behalf of Bay Harbor by virtue of her role as personal representative of Proctor's estate—signed a second promissory note in favor of Sumsion (the Second Promissory Note). The Second Promissory Note explained that the note would "become due and payable upon the sale of any of [Bay Harbor's] real property interests."

¶13    In July 2014, soon after this court issued its decision in *Bay Harbor I*, Sumsion initiated a separate lawsuit against Bay Harbor, attempting to foreclose upon Bay Harbor's property pursuant to his lien. Sumsion also sued Bay Harbor for breach of contract related to the 2005 Engagement Letter and the First Promissory Note. Sumsion also brought a claim for unjust enrichment.

¶14    Bay Harbor moved for summary judgment, asserting that Proctor did not have authority to retain Sumsion on its behalf, because two-thirds of the profit-sharing members of Bay Harbor did not authorize Sumsion's retention. Bay Harbor further argued that Sumsion's claims were time-barred because (1) Sumsion's claims accrued in August 2006; (2) he did not file this suit until July 2014; and (3) under either the four-year or six-year statutes of limitations, all of Sumsion's claims were untimely.

¶15    After full briefing and a hearing, the district court granted Bay Harbor's summary judgment motion, agreeing with both of Bay Harbor's arguments. The court explained that "[w]ithout the agreement of at least two-thirds of those holding a profits interest in a company, a company cannot be bound by the acts of a member on behalf of the company if those acts are outside the ordinary course of the company's business." The court then determined that "Proctor was not acting in the ordinary course

of business" when he hired Sumsion. The court further concluded that Weed, Bay Harbor's other manager, did not assent to engaging Sumsion, and therefore less than two-thirds of Bay Harbor's profit-sharing members assented to hiring Sumsion. On the statute of limitations argument, the district court determined that Sumsion's claim accrued in August 2006, and that, under either the four-year or six-year statute of limitations period, Sumsion's claims were time-barred.

ISSUE AND STANDARD OF REVIEW

¶16 Sumsion now appeals the district court's summary judgment ruling. "The court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). We review a court's summary judgment ruling for correctness. *Lauritzen v. First Am. Title Ins. Co.*, 2018 UT App 58, ¶ 9.

ANALYSIS

¶17 In order to evaluate the correctness of the district court's summary judgment ruling, we must confront two broad questions: (1) whether Sumsion was properly retained by Bay Harbor; and (2) whether Sumsion's claims were timely filed. We address these questions in turn.

I

¶18 Bay Harbor maintains that it did not ever properly retain Sumsion.[4] Its version of events is that Proctor retained Sumsion

---

4. Bay Harbor's current counsel maintains that he can properly represent Bay Harbor and take litigation positions on its behalf

(continued…)

to represent him personally in the Workers' Compensation Litigation—it was, after all, Proctor who was running the farm at that point—and that Proctor had no authority to hire Sumsion to represent Bay Harbor. To evaluate the soundness of this argument, we must first determine which version of the Utah LLC statute governs this situation. Next, we must examine whether the "default" terms of that statute were ever varied by the parties. Finally, we must determine whether two-thirds of the voting interests of Bay Harbor assented to Sumsion's representation.

A

¶19    Utah statutory law governing limited liability companies has evolved over time in many ways. Specifically relevant here are the rules governing the types of actions a member or manager of an LLC can take without the consent of the other members or managers. In 1994, when Bay Harbor was created, the governing statute provided that "[t]he management of [an LLC], unless otherwise provided in the articles of organization, shall be vested in its members,"and that "[i]f the management of the [LLC] is vested in the members, any member has authority to bind the [LLC], unless otherwise provided in the articles of organization." Utah Code Ann. § 48-2b-125(1) (Michie Supp.

---

(…continued)
because he was retained, after Proctor's death, by Weed, who had authority to act for and on behalf of Bay Harbor because, after Proctor's death, Weed owns more than 2/3 of the voting interests of Bay Harbor and is the only remaining manager of Bay Harbor. We are not asked to decide whether Bay Harbor's current counsel's position is correct, because Sumsion does not contest the propriety of current counsel's representation of Bay Harbor.

1992). Thus, during its early years, the governing statute allowed any member of Bay Harbor to bind it.

¶20    The legislature overhauled the governing statute in 2001, however, and at the time Proctor retained Sumsion to work on the Workers' Compensation Litigation in 2005, the statute provided that, "unless otherwise provided in the articles of organization or operating agreement of the company," "approval by the requisite number of members, as well as all of the managers, shall be required as to all matters described in Subsections 48-2c-803(2) and (3)." *Id.* § 48-2c-804(6)(g) (LexisNexis 2002).[5] Subsection 48-2c-803(3), in turn, provided that "the affirmative vote, approval, or consent of members holding 2/3 of the profits interests in the company shall be required to bind the company . . . to do any act on behalf of the company that is not in the ordinary course of the company's business." *Id.* § 48-2c-803(3)(a). Thus, at that time, two-thirds of Bay Harbor's profit-sharing members, as well as all of its managers, had to approve any action "not in the ordinary course of the company's business." *Id.* As discussed above, Weed and Proctor each held a 45% interest in Bay Harbor, and were both still listed as managers. Thus, the governing statute required both Weed and Proctor to authorize any extraordinary action; neither, acting alone, could bind the company for any actions taken that were "not in the ordinary course of the company's business." *Id.*

¶21    In 2013, the legislature again amended the statutes governing LLCs. Under the current version of the law, in a

---

5. We quote here the statute in effect in February 2005, when Sumsion began work on the Workers' Compensation Litigation. Effective in May 2005, the statute was amended, but the 2005 amendments are not material to our analysis. *See* Utah Code Ann. § 48-2c-804(6)(g)(ii) (LexisNexis Supp. 2005).

manager-managed LLC, an act "outside the ordinary course of the limited liability company's activities and affairs" requires "[t]he affirmative vote or consent of all members." *Id.* § 48-3a-407(3)(c)(ii) (LexisNexis 2015). Thus, under current law, unanimity is required for a manager to be able to bind an LLC for any act outside the LLC's ordinary course of business.

¶22 Sumsion purported to start providing legal services to Bay Harbor beginning in February 2005, and the written contracts upon which he relies were executed in December 2005. On appeal, both parties appear to agree that the 2005 version of the governing statute applies, and we see no reason to view the matter differently. *See State v. Clark*, 2011 UT 23, ¶¶ 11–12, 251 P.3d 829 (noting that "courts must apply the law in effect at the time of the occurrence regulated by that law" and that "parties' substantive rights and liabilities are determined by the law in place at the time when a cause of action arises, not by a subsequently enacted statute" (quotation simplified)). Thus, for the purposes of adjudicating this appeal, we apply the law in effect in February 2005, at the time Sumsion asserts that he entered into a binding contract with Bay Harbor.

B

¶23 Under the version of the statute in effect in February 2005, the support of at least two-thirds of Bay Harbor's profit-sharing members was required for any action that was "not in the ordinary course of the company's business," Utah Code Ann. § 48-2c-803(3)(a) (LexisNexis 2002), unless that statutory default rule was altered "in the articles of organization or operating agreement of the company," *id.* § 48-2c-804(6)(g).

1

¶24 The district court determined that hiring Sumsion was "not in the ordinary course" of Bay Harbor's farm and agricultural business. On appeal, Sumsion does not

meaningfully engage with the district court's determination in this regard. In the body of his opening brief,[6] he mentions the issue only in passing, and even appears to concede the point, stating simply that "[e]ven if . . . the act of engaging . . . Sumsion to defend against a farm-hand's workers' compensation lawsuit was not in the company's ordinary course of business," he should nevertheless prevail because of his alternative argument (discussed below) that Weed agreed to vary or waive the statutory default rule. He also includes a footnote, in which he states in rather conclusory fashion that he "should be allowed to argue at trial that [his retention] was in the ordinary course of business," but even there he does not cite any fact contained in the record, or any case law at all, that would support such an argument. Accordingly, we conclude that any argument that Bay Harbor's retention of Sumsion was within the ordinary course of Bay Harbor's business is inadequately briefed.

¶25    Rule 24 of the Utah Rules of Appellate Procedure requires a party to "explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal." Utah R. App. P. 24(a)(8). Our supreme court, in discussing what it takes to carry one's burden of persuasion on appeal, has stated as follows:

> [A]t the very least, an argument should clearly identify the contention, cite supporting authority, distinguish contrary authority, cite pertinent facts in the record (and provide citations to the record so

---

6. Sumsion devotes two paragraphs, and slightly more analysis, to the question in his reply brief. However, we cannot consider matters meaningfully raised for the first time in a reply brief. *2010-1 RADC/CADC Venture, LLC v. Dos Lagos, LLC*, 2017 UT 29, ¶ 33 n.10, 408 P.3d 313 (stating that "issues are not properly presented if they are argued for the first time in a reply brief").

> opposing counsel and the reviewing court can find
> them), analyze the facts through the lens of the
> cited law, and explain what the result should be.

*Rose v. Office of Prof'l Conduct*, 2017 UT 50, ¶ 65. Sumsion offers no argument supported by authority, no citation to the record, and no reasoned analysis of why Bay Harbor engaging him to provide legal services to defend a workers' compensation claim arising after it no longer operated the farm was within Bay Harbor's ordinary course of business. Thus, on this issue, Sumsion's brief is inadequate, and he has failed to carry his burden of persuasion on appeal. We therefore accept the district court's determination that the retention of Sumsion in the Workers' Compensation Litigation was outside the ordinary course of Bay Harbor's business.[7]

2

¶26 Sumsion does vigorously argue that Proctor and Weed agreed to vary, or waive, the two-thirds rule. As noted, the governing statute allows companies to vary the rule, as long as they do so "in the articles of organization or operating agreement." *See* Utah Code Ann. § 48-2c-804(6) (LexisNexis 2002). Sumsion does not contend that any such waiver occurred in Bay Harbor's Articles of Organization; that document contains

---

7. Our decision in this regard is a non-merits decision that is not intended to have precedential value. Indeed, a company's retention of an attorney may often be within the ordinary course of a company's business. Business entities (such as LLCs) cannot appear in court without a licensed attorney, *see Mower v. Moyer*, 2017 UT App 188, ¶ 2 n.3, 405 P.3d 978, and we can certainly envision many situations where a company's retention of an attorney would be considered part of its ordinary course of business.

no language that could possibly be so construed. Rather, Sumsion argues that Proctor and Weed made an "agreement" to vary the two-thirds rule. We are unpersuaded.

¶27   As we have noted, Bay Harbor has never had a written operating agreement. Sumsion acknowledges this fact, but asserts that Proctor and Weed had an unwritten "agreement," characterized by their "course of dealing," that "neither [of them] believed the 2/3 rule to be in effect," and that either of them could bind the company for any matter, even matters that may be considered outside the company's ordinary course of business. In support of his argument, Sumsion relies upon the Uniform Commercial Code's (UCC) definition of "agreement," which, in 2005, provided that an "agreement" is "the bargain of the parties in fact, as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance." *See id.* § 70A-1a-201(3) (LexisNexis 2001); *see also id.* § 70A-2-202(1) (LexisNexis 2001) (stating that contractual terms "may be explained or supplemented . . . by course of dealing or usage of trade . . . or by course of performance"). We reject this argument, for two reasons.

¶28   First, Sumsion does not explain why the UCC should apply in this situation. If a contract is for services rather than for goods, the UCC has little, if any, application. *See id.* § 70A-2-102 (LexisNexis 2009) (stating that the chapter of the UCC pertaining to sales applies only to "transactions in goods"); *see also Wirthlin v. Mameco Int'l, Inc.*, 2004 UT App 16U, para. 7 n.1 (stating that where a transaction is "exclusively for services," the UCC is not applicable). Sumsion makes no effort to explain how an agreement between LLC managers to vary a statutory default rule is a "transaction in goods" rather than a transaction for services.

¶29   Second, and more fundamentally, Sumsion overlooks the fact that the governing LLC statute itself contains a definition of

"operating agreement." "When interpreting a statute, it is axiomatic that [the court's] primary goal is to give effect to the legislature's intent in light of the purpose that the statute was meant to achieve." *State v. Ogden*, 2018 UT 8, ¶ 31, 416 P.3d 1132 (quotation simplified). "The best evidence of the legislature's intent is the plain language of the statute itself." *Id.* (quotation simplified). We need not look to other statutes for a definition of the relevant term when the statute in question internally defines it. *See O'Hearon v. Hansen*, 2017 UT App 214, ¶ 24, 409 P.3d 85 (observing that if the statute in question defined a term at issue "we would of course look there first"); *cf. Barneck v. Utah Dep't of Transp.*, 2015 UT 50, ¶ 2, 353 P.3d 140 (engaging in a plain language analysis only after concluding that the term at issue was not defined by the relevant statute); *Hi-Country Prop. Rights Group v. Emmer*, 2013 UT 33, ¶ 18, 304 P.3d 851 (same).

¶30    Significantly here, the version of the LLC statute in effect in 2005 unambiguously required that an "operating agreement" be in writing. That statute defined "operating agreement" as "any *written agreement* of the members," including "any *written amendments* agreed to by all members or other writing adopted in any other manner as may be provided in the operating agreement." Utah Code Ann. § 48-2c-102(16) (LexisNexis 2002) (emphasis added).[8] Under the plain terms of the governing statute, we cannot infer an intent to vary the statutory default rule from the LLC managers' unwritten course of dealing. Under

---

8. The current statute, as amended in 2013, no longer requires operating agreements to be in writing. *See* Utah Code Ann. § 48-3a-102(16) (LexisNexis 2015) (defining "operating agreement" as "the agreement, whether or not referred to as an operating agreement and whether oral, implied, in a record, or in any combination thereof, of all the members of a limited liability company"). Sumsion makes no argument that the current version of the statute ought to apply here.

the operative statute, any variation from the statutory default rule must be memorialized in an "operating agreement," which (at the time) was statutorily required to be in writing.

¶31 Sumsion makes no contention that there is any written agreement between Proctor and Weed evidencing a variance from the statutory default rule. Accordingly, the district court correctly determined, as a matter of law, that the 2/3 rule applied in this case.

C

¶32 Next, Sumsion argues that, even if the 2/3 rule was in effect and required that two-thirds of Bay Harbor's profit-sharing interests agree to his retention, the 2/3 rule was satisfied in this case because Weed assented to his retention. On the record before us, we disagree.

¶33 Sumsion is unable to direct our attention to any express assent by Weed to Sumsion's retention,[9] or even to any competent evidence that Weed had specific knowledge of Sumsion's retention.[10] Instead, Sumsion points out that Weed

---

9. Sumsion does assert that "Weed acknowledged that [Bay Harbor] had retained Sumsion as legal counsel for [Bay Harbor] concerning the [the Workers' Compensation Litigation] and voiced no opposition to Sumsion's representation of [Bay Harbor], either before or during the representation." But the only factual support Sumsion cites for this assertion is his own complaint in this case. It should go without saying that bare allegations in complaints do not constitute factual support for the propositions they assert.

10. Sumsion attempts to argue that Weed had direct knowledge of the fact that Proctor retained Sumsion to represent Bay Harbor in the Workers' Compensation Litigation. But the only evidence

(continued…)

knew about the Workers' Compensation Litigation, knew that Bay Harbor was a defendant in that litigation, and knew that he personally made no response to that lawsuit (despite having been served with notice) other than to send a letter to the Labor Commission. Sumsion asks us to infer from these facts that Weed knew that Proctor must have retained an attorney to represent the company, and that Weed's awareness of the litigation, coupled with his failure to raise any objection to Proctor's decision to retain an attorney, indicates his assent to that retention.

¶34     In support of this contention, Sumsion argues that *Bullock v. Department of Transportation*, 966 P.2d 1215 (Utah Ct. App. 1998), and *Zions Gate R.V. Resort, LLC v. Oliphant*, 2014 UT App 98, 326 P.3d 118, both stand for the proposition that a principal's

---

(…continued)

supporting this contention to which Sumsion directs our attention is a declaration of Anna Proctor that Sumsion attaches to his opening brief, wherein Anna avers that "Weed knew that we had retained . . . Sumsion . . . to represent Bay Harbor and Don and me personally." That declaration, however, was never properly before the district court, and is not properly part of the appellate record before us. That declaration was submitted to the district court in *Bay Harbor I*, not in this case, and was never made part of the record in this case. At one point, Sumsion asked the district court to take judicial notice of the entire *Bay Harbor I* record, and even went so far as to attach to his motion that entire prior record, but the district court denied Sumsion's motion and declined to take judicial notice of the record from the earlier case. Sumsion does not appeal the district court's decision to decline to take judicial notice of the prior record. Accordingly, that declaration was not part of the district court record in this case, and Sumsion's attempt to bring it to our attention by attaching it to his brief is improper.

inaction in the face of full knowledge amounts to ratification of another principal's actions. Even assuming, without deciding, that Sumsion has stated the correct legal standard,[11] Sumsion's cited cases both require that the principal have both (a) full knowledge of the action potentially subject to ratification, and (b) an actual intent to ratify. *See Bullock*, 966 P.2d at 1219 (noting that "'ratification requires the principal to have knowledge of all material facts and an intent to ratify'" (quoting *Zions First Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1098 (Utah 1988))); *see also Oliphant*, 2014 UT App 98, ¶ 16 (stating that "[r]atification is premised upon the knowledge of all material facts and upon an express or implied intention on the part of the principal to ratify" (quotation simplified)). These cases cannot carry the day for Sumsion, because Sumsion is simply unable to point to any competent evidence that Weed had "full knowledge of the facts." *See Moses v. Archie McFarland & Son*, 230 P.2d 571, 574 (Utah 1951).

¶35    Under these circumstances, the district court did not err by entering summary judgment in favor of Bay Harbor on this issue. Under rule 56 of the Utah Rules of Civil Procedure, "[t]he

---

11. At least some cases suggest that inaction alone is insufficient, and that at least some sort of affirmative conduct is required in order for a court to find that a principal has ratified another principal's actions. *See Franklin Credit Mgmt. Corp. v. Hanney*, 2011 UT App 213, ¶ 39, 262 P.3d 406 (stating that "[w]hile our cases are clear that 'silence with full knowledge of the facts may manifest affirmance,' they also require conduct . . . 'which indicates assent by the purported principal to become a party to the transaction'" (emphasis added) (quoting *Moses v. Archie McFarland & Son*, 230 P.2d 571, 574 (Utah 1951))); *see also Dillon v. Southern Mgmt. Corp. Ret. Trust*, 2014 UT 14, ¶ 31, 326 P.3d 656 (citing *Moses* with approval); *Bradshaw v. McBride*, 649 P.2d 74, 78 (Utah 1982) (same).

court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). In its summary judgment motion, Bay Harbor asserted that "Weed has never approved Sumsion's representation of Bay Harbor in the work giving rise to Sumsion's claims." In support of this assertion, Bay Harbor cited an affidavit from Weed where he declared, "I have never agreed . . . to the repayment of indebtedness . . . of *any* Bay Harbor property for the benefit of . . . Sumsion." Weed further declared that he "did not sign the engagement letter and did not give approval for Bay Harbor to enter an agreement that could lead to substantially all of Bay Harbor's assets being encumbered." Moreover, Bay Harbor also cited deposition testimony in which Weed testified that he did not know that Sumsion had been retained in the Workers' Compensation Litigation until approximately October 2006, well after Sumsion had completed his work on the case.

¶36    On summary judgment, "[i]t only takes one sworn statement under oath to dispute the averments on the other side of a controversy and create [a genuine dispute] of [material] fact." *Zundel v. Magana*, 2015 UT App 69, ¶ 10, 347 P.3d 444 (quotation simplified). The evidence to which Sumsion points, however, is simply not strong enough to create a genuine dispute of material fact. To overcome summary judgment, a party must do more than simply assert that a factual dispute exists. *See JENCO LC v. Perkins Coie LLP*, 2016 UT App 140, ¶ 15, 378 P.3d 131 (observing that, in a summary judgment proceeding, "the parties must submit admissible evidence," and stating that "unsubstantiated conclusions and opinions are inadmissible" (quotation simplified)). Other than merely asserting that a factual dispute exists, on appeal Sumsion has not pointed to any evidence in this record establishing that Weed had knowledge of Proctor engaging Sumsion, and certainly no evidence that Weed assented to Proctor's retention of Sumsion.

¶37    Because the governing statute required that at least two-thirds of Bay Harbor's profit-sharing members approve Sumsion's retention, and because only Proctor actually did approve it, Bay Harbor never properly retained Sumsion. The district court correctly determined, on summary judgment, that Bay Harbor was not Sumsion's client in the Workers' Compensation Litigation, and that therefore Bay Harbor did not ever enter into any contract with Sumsion for the provision of legal services. Accordingly, the district court properly dismissed Sumsion's breach of contract claims on summary judgment.

II

¶38    While our conclusion that Bay Harbor never actually entered into a contract for legal services with Sumsion in connection with the Workers' Compensation Litigation leads to dismissal of Sumsion's claims for breach of contract, that conclusion does not necessarily dispose of Sumsion's claim for unjust enrichment. Unjust enrichment is an "equitable tool" that, even in the absence of an actual contract, sometimes "allows a plaintiff to receive restitution for the reasonable value of services provided to the defendant." *Emergency Physicians Integrated Care v. Salt Lake County*, 2007 UT 72, ¶ 10, 167 P.3d 1080. We conclude, however, that Sumsion's claim for unjust enrichment is barred by the applicable statute of limitations.

¶39    A claim for unjust enrichment is subject to a four-year statute of limitations. *See* Utah Code Ann. § 78B-2-307(3) (LexisNexis 2017) ("An action may be brought within four years . . . for relief not otherwise provided for by law."); *see also Pero v. Knowlden*, 2014 UT App 220, ¶ 16, 336 P.3d 55 (stating that the lower court "properly employed" Utah Code section 78B-2-307(3) "in evaluating the timeliness of [the plaintiff's] unjust enrichment claim"). Here, the district court found that "the limitations period accrued no later than August 14, 2006," thirty days prior to when Sumsion first filed his attorney's lien. On

appeal, Sumsion does not challenge the district court's calculation of the date on which the statute of limitations began to run. Thus, under the applicable statute of limitations, Sumsion was required to sue Bay Harbor by no later than August 14, 2010. However, Sumsion did not sue Bay Harbor until July 10, 2014. Thus, Sumsion's claim for unjust enrichment would appear to be time-barred.

¶40    Sumsion resists this conclusion on three grounds. First, Sumsion argues that the Second Promissory Note effectively tolled any potentially applicable statute of limitations. Second, Sumsion argues that the statute should have been tolled during the pendency of *Bay Harbor I*. And finally, Sumsion asserts that Bay Harbor's defense on this claim is barred by the doctrine of laches. We reject each of these arguments.

¶41    Sumsion's first argument is that "the statute of limitations should have stopped when . . . Sumsion graciously cancelled his demand and signed a forbearance agreement,"[12] referring to the Second Promissory Note that Anna signed where she purported to agree, on behalf of Bay Harbor, to pay Sumsion "upon the sale of any of [Bay Harbor's] real property interests." This argument cannot overcome two separate infirmities. First, the Second Promissory Note is not properly before us, because it was never made part of the record before the district court. *See supra* ¶ 33 n.10. Second, and more substantively, Sumsion makes no effort to explain how the Second Promissory Note could possibly bind Bay Harbor, since it was signed only by Anna, an individual who has never been a member or manager of Bay Harbor.

¶42    Sumsion next argues that *Bay Harbor I*'s litigation proceedings tolled the statute of limitations. Even assuming,

---

12. This statement is factually inaccurate, because the document does not purport to be a "forbearance agreement," and it is not actually signed by Sumsion.

without deciding, that *Bay Harbor I* tolled the statute of limitations applicable to any cause of action Sumsion might have had, Sumsion's unjust enrichment claim is still time-barred. As discussed, this claim accrued on August 14, 2006, and the four-year statute of limitations expired on August 14, 2010. *See supra* ¶ 39. Bay Harbor did not demand that Sumsion release his lien until June 2011, *see Bay Harbor I*, 2014 UT App 133, ¶ 3, and did not file suit against Sumsion to nullify the lien until April 2012. Thus, the four-year statute of limitations expired before Bay Harbor even initiated the litigation that resulted in our opinion in *Bay Harbor I*.

¶43 Finally, Sumsion asserts that "[Bay Harbor] has waited too long to challenge Sumsion's lien" and that "the doctrines of laches and waiver apply to the matter at hand and call for the lien to be upheld and enforced." Sumsion did not raise this legal theory before the district court, and therefore this argument is unpreserved. "We generally do not address unpreserved arguments raised for the first time on appeal." *Pulham v. Kirsling*, 2018 UT App 65, ¶ 53 (quotation simplified). Sumsion has not asserted any reason why we should nonetheless address this new legal theory for the first time on appeal. We therefore decline to consider the matter further.

¶44 Accordingly, we conclude that Sumsion's claim for unjust enrichment is time-barred by the applicable four-year statute of limitations. The district court correctly entered summary judgment in favor of Bay Harbor on Sumsion's unjust enrichment claim.

III

¶45 Having determined that (1) Bay Harbor did not actually enter into a binding contract with Sumsion for legal services, and (2) Sumsion's claim for unjust enrichment is time-barred, we must finally consider whether Sumsion's attorney's lien has any substance. "In Utah an attorney's lien arises by operation of law

*for the balance of compensation due from a client . . . ."* *Rehn v. Christensen*, 2017 UT App 21, ¶ 43, 392 P.3d 872 (emphasis added); *see also* Utah Code Ann. § 38-2-7(2) (LexisNexis Supp. 2017) ("An attorney shall have a lien *for the balance of compensation due from a client . . . .").* As we have determined, Bay Harbor never actually entered into a contract with Sumsion, and Sumsion's claim for unjust enrichment is time-barred. Thus, there is no "compensation due" to Sumsion from Bay Harbor. Because Bay Harbor does not owe Sumsion any compensation, there is no basis for his lien, and therefore his lien foreclosure claim necessarily fails.

IV

¶46    After the district court granted Bay Harbor's summary judgment motion, Bay Harbor moved for an award of attorney fees pursuant to Utah Code section 78B-5-826 (LexisNexis 2012), which provides that "[a] court may award costs and attorney fees to either party that prevails in a civil action based upon any promissory note." The court granted Bay Harbor's motion. Bay Harbor now seeks attorney fees it incurred on appeal, and Sumsion mounts no argument that Bay Harbor should not be entitled to its attorney fees on appeal should we reject his arguments. "In general, when a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *CORA USA LLC v. Quick Change Artist LLC*, 2017 UT App 66, ¶ 7, 397 P.3d 759 (quotation simplified). Because Bay Harbor has prevailed on appeal, we grant Bay Harbor's request, and remand the case to the district court for a determination of reasonable fees and costs incurred on appeal.

CONCLUSION

¶47    The district court correctly entered summary judgment in favor of Bay Harbor on all of Sumsion's claims. Bay Harbor was

never Sumsion's client in the Workers' Compensation Litigation, and Sumsion's claim for unjust enrichment is barred by the applicable statute of limitations. Because Sumsion has no valid substantive claims against Bay Harbor, Sumsion's lien claim must necessarily also fail. We therefore affirm the judgment of the district court, and remand the case to the district court for the limited purpose of quantifying Bay Harbor's reasonable attorney fees and costs incurred on appeal.

———————